

FILED

MAR 28 2018

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA

**FOR PUBLICATION**

**UNITED STATES BANKRUPTCY COURT**

**EASTERN DISTRICT OF CALIFORNIA**

In re:

OAKHURST LODGE, INC.

             Debtor.

Case No. 11-17165-A-11

**MEMORANDUM**

AJM-3

Argued and submitted on November 15, 2017

at Fresno, California

Honorable Fredrick E. Clement, Bankruptcy Judge Presiding

Appearances:    Donna M. Standard, Attorney at Law, for
Oakhurst Lodge, Inc.; Aaron J. Malo and
Robert K. Sahyan, Sheppard, Mullin,
Richter & Hampton, LLP for First-Citizens
Bank & Trust Company; Sonia Plesset
Edwards, Wright, Finlay & Zak, LLP for
Total Lender Solutions, Inc.; Michael
Heath, Law Offices of Michael Heath, for
Oakhurst Lodge, LP; Steven K. Marshall, in
propria persona

1    A debtor that owned and operated a motel encumbered by a bank's

2    liens filed chapter 11[1] bankruptcy.  It confirmed a reorganization plan

3    that maintained the automatic stay in effect post-confirmation and

4    restructured its secured and unsecured debt.  The confirmed plan

5    binds. It obligates the debtor to pay creditors over time the amounts

6    specified in the plan and creditors to withhold collection efforts

7    while receiving their plan payments.

8    But the bank violated the stay by foreclosing its liens.  This

9    violation precluded the debtor from paying creditors the amount

10   promised in the plan.  Later, the debtor and the bank settled the

11   stay-violation dispute for one-half of the amount promised to

12   creditors under the plan.  The settlement also did not disturb the

13   foreclosure sale or restore ownership of the motel to the debtor.  At

14   the bank's request, should the court now enforce the settlement?

15   **I.    FACTS**

16   **A.    Chapter 11 Filing**

17   Oakhurst Lodge Inc. ("Oakhurst Lodge") owned and operated a 60-

18   room motel.  It had several shareholders including Steven Marshall

19   ("Marshall"), Chet Patel, and Sam Patel.

20   Unable to meet its financial obligations and wishing to continue

21   operations, it filed a chapter 11 bankruptcy.  Its most significant

22   asset was the motel, as well as the fixtures, furniture and equipment

23   necessary to operate it.  Liabilities included seven secured debts,

24   aggregating $3.9 million dollars.[2]  The bulk of its secured debt

25

26   [1] Unless specified otherwise, all chapter and section references are to the
     Bankruptcy Code, 11 U.S.C. §§ 101-1532, and all "Rule" references are to the
     Federal Rules of Bankruptcy Procedure, Rules 1001-9037.  All "Civil Rule"
27   references are to the Federal Rules of Civil Procedure, Rules 1-86.

28   [2] The amounts due each creditor or class of creditors are referenced in the

1  encumbered the motel and the land on which it sits.  Those secured

2  creditors include: (1) First-Citizens Bank & Trust Company ("First-

3  Citizens Bank"), which held notes for $3.08 million dollars secured by

4  first and second trust deeds; (2) the Collier Partnership ("Collier

5  Partnership"), which held a note for $324,000 secured by a third trust

6  deed; (3) the Olsen Family Trust ("Olsen Trust"), which held a note

7  for $392,000 secured by a fourth trust deed; and (4) the County of

8  Madera, which was owed secured real property taxes of $125,000.

9  Oakhurst also owed priority unsecured tax debt of $202,000,[3] non-

10  priority unsecured debt owed to non-insiders of $112,000,[4] and non-

11  priority unsecured debt owed to insiders of $493,000.[5]

12      Oakhurst Lodge proposed, and confirmed, a five-year plan of

13  reorganization.  Funded by a one-time capital contribution of $230,000

14  from shareholders and by 60 monthly payments of $31,000 to $33,000

15  from motel operations, the plan had five key components.  First, it

16  restructured the secured debts owed to First-Citizens Bank, the

17  Collier Partnership, and the Olson Trust.  It reamortized First-

18

19  Debtor's Combined Disclosure Statement and Plan of Reorganization §§ 6.01-
20  6.10, Nov. 9, 2011, ECF No. 79, the Amended Exhibits for Chapter 11 Plan and
    Disclosure Statement Ex. B, Jan. 26, 2012, ECF No. 118, and the Order
    Confirming Debtor's Plan of Reorganization Ex. A (Stipulation Resolving
21  Objection), Feb. 29, 2012, ECF No. 124.  Amounts due creditors are rounded to
    the nearest thousand dollars.
22
    [3] Unsecured priority tax debt comprises the following debts: a $5,000 debt to
23  the Franchise Tax Board; a $4,000 debt to the California Employment
    Development Department; a $150,000 debt to the County of Madera; and a
24  $43,000 debt to the Internal Revenue Service.  See Debtor's Combined
    Disclosure Statement and Plan of Reorganization § 4.02, Nov. 9, 2011, ECF No.
25  79; Order Confirming Debtor's Plan of Reorganization Ex. A (Stipulation
    Resolving Objection ¶ 2), Feb. 29, 2012, ECF No. 124.
26
    [4] Non-insider unsecured claims total $111,847.16.  See Am. Exs. for Ch. 11
27  Plan and Disclosure Stmt. Ex. B, Jan. 26, 2012, ECF No. 118.

28  [5] Am. Exs. for Ch. 11 Plan and Disclosure Stmt. Ex. B at 1 (column 9, line
    26).

Citizens Bank's notes with a 22-year period of monthly payments and
the entire debt becoming due and payable at the end of the 22-year
period.  It deferred payments for 12 months on the Collier
Partnership's secured debt, added accrued but unpaid interest to the
principal amount of the debt, reamortized the debt over 30 years with
an interest rate of 5.5% and with monthly payments commencing in the
13th month following confirmation, and fixed a maturity date on the
entire debt that was 11 years after plan confirmation.  It deferred
payments on the Olson Trust's secured debt until First-Citizens Bank's
entire secured debt was paid in full, provided an interest rate of 6%
on such debt, and fixed a maturity date on the entire debt falling
immediately after payment of First-Citizens Bank's secured debt.  Each
of these creditors retained its lien.

Second, excepting unsecured debt due insiders, over its five-year
life, the plan paid (usually with interest) short-term secured debt,
priority tax debt, and unsecured debt.  The secured property tax debts
owed to Madera County were to be paid in full with 5% interest.  Both
debts secured by personal property were reamortized over 5 years and
were to be paid in full including 4% interest.  Priority unsecured tax
debt was to be paid in full plus unquantified statutory interest.
Unsecured debts held by non-insiders were to be paid in full without
interest.  The plan paid insider unsecured creditors nothing.

Third, the rights of existing equity holders were terminated.  In
exchange for a capital contribution of $230,000, Steven Marshall and
Jack Patel became the new equity holders, each having an equal
interest in Oakhurst Lodge.

Fourth, the plan deferred the discharge until completion of
payments under the plan.  It did not revest estate property upon

4

confirmation in Oakhurst Lodge as a reorganized debtor.  Thus, it
retained the protections of the automatic stay over the 5-year
lifespan of the confirmed plan.

Fifth, the plan reserved to Oakhurst Lodge all claims and rights
against third parties, regardless of whether they arose before or
after the petition or whether they arose before or after confirmation.

At confirmation, unpaid professional fees aggregated $12,000.[6]
And the plan obligated Oakhurst Lodge to pay these administrative
expenses in full in cash after such amounts were allowed by the court.[7]

Unfortunately, Oakhurst Lodge did not fully perform its
obligations under the confirmed plan.[8]

**B.    Foreclosure Sale**

Four months after confirmation, First-Citizens Bank commenced
proceedings to foreclose its trust deeds encumbering the motel.  It
did not first obtain relief from the automatic stay.  Approximately
ten months after plan confirmation, the bank completed its
foreclosure.  At the foreclosure sale, First-Citizens Bank was the
successful bidder and acquired title to the property.

After acquiring title to the motel, First-Citizens Bank evicted
Oakhurst Lodge, Inc. and sold the motel to Oakhurst Lodge, LP, an

---

[6] *See* Order, Mar. 9, 2012, ECF No. 132; Order, Apr. 4, 2012, ECF No. 134.

[7] *See* Debtor's Combined Disclosure Statement and Plan of Reorganization § 4.04, Nov. 9, 2011, ECF No. 79.

[8] At oral argument, the parties agreed that Oakhurst Lodge did not fully perform its obligations under the plan.  Oakhurst contends that there was partial performance; First-Citizens Bank contends there was no performance. Only one post-confirmation report shows distributions to creditors. Quarterly Post-Confirmation Report for Reorganized Debtor, Dec. 21, 2012, ECF No. 167 (showing total distributions of $126,536.70).  In addition, Steven Marshall contended at oral argument that he, but not Jack Patel, made the capital contributions required by the plan.

entity similar in name but unrelated to Oakhurst Lodge. Oakhurst

Lodge, LP has operated the motel since acquiring it.

### C.   Conversion and Dismissal

About the time that First-Citizens Bank completed its foreclosure
sale, the U.S. Trustee filed its motion to convert the case to chapter
7 or dismiss it. It did so because Oakhurst Lodge had not filed three
post-confirmation quarterly operating reports and had not paid the
post-confirmation fees due the U.S. Trustee. This court granted the
motion and converted the case to chapter 7.

Shortly after his appointment, the chapter 7 trustee gave notice
of an intent to abandon the "60-unit motel with residence" and "all
fixtures and equipment involved in the operation of the motel." When
timely opposition was not filed in response, the trustee abandoned the
motel, residence, and the fixtures and equipment used for its
operation.[9]

After Oakhurst Lodge failed to appear at two meetings of
creditors, the trustee moved to dismiss the chapter 7 case. The court
dismissed the case. The chapter 7 trustee issued a report of no
distribution, and the clerk closed the case.

### D.   Stay-Violation Litigation

Next, Oakhurst Lodge commenced an action against First-Citizens
Bank in state court. This litigation continued unresolved for two
years.

It then filed an adversary proceeding in bankruptcy court against
First-Citizens Bank, Oakhurst Lodge, LP (the ultimate buyer of the

---

[9] After the trustee abandoned the motel, Oakhurst Lodge, Inc., acting in
propria persona through its president Steven Marshall filed an untimely
opposition to the abandonment.

motel), and Total Lender Solutions (the party who conducted the sale). Though the adversary complaint pleads causes of action for quiet title, cancellation of instruments, constructive trust, and civil contempt, the factual basis for each claim is the foreclosure of the motel in violation of the stay.

### E.    Mediation and Settlement

In the adversary proceeding, this court ordered the parties to mediation and appointed a mediator.  After mediation, the parties reached a resolution of the dispute and reduced their settlement to writing.[10]  Marshall signed the settlement agreement as president of Oakhurst Lodge.  Notwithstanding admonitions by the court prior to the mediation, Marshall believed that any settlement funds received need not be remitted to creditors according to the terms of the confirmed plan.

The settlement required approval by this court.  It provided First-Citizens Bank would waive any right to further payment under its notes secured by the first and second deeds of trust and would pay Oakhurst Lodge $850,000 in exchange for a release of claims and dismissal of pending litigation.[11]  The settlement contains an implied corollary: First-Citizens Bank's foreclosure sale would remain effective and its buyer would retain the motel.

---

[10] First-Citizens Bank's Status Report Ex. B (Stipulation for Settlement), July 11, 2016, ECF No. 205.

[11] First-Citizens Bank's Status Report Ex. B (Stipulation for Settlement ¶ 14), July 11, 2016, ECF No. 205.  These terms of the settlement were also represented to the court by First-Citizens Bank at a September 2016 status conference and at oral argument on the present motion to enforce the settlement.  Am. Civil Minutes at 1, *Oakhurst Lodge, Inc. v. First-Citizens Bank & Trust Company*, Adv. No. 15-1017 (Bankr. E.D. Cal. Sept. 20, 2016), ECF No. 255.

1      **F.    Vacated Orders**

2          Later, this court vacated the order converting the case to

3      chapter 7 and the order dismissing the chapter 7.  This restored

4      Oakhurst Lodge's case to chapter 11.

5      **II.  PROCEDURE**

6          Oakhurst Lodge, acting through Marshall, repudiated the

7      settlement agreement with First-Citizens Bank.  First-Citizens Bank

8      has responded by filing the present motion to enforce the settlement

9      agreement.

10         The other adversary proceeding defendants have joined in the

11     motion.  Oakhurst Lodge and Steven Marshall, acting as an equity

12     holder, oppose the motion.

13     **III. JURISDICTION**

14         This court has jurisdiction to decide this motion.  At the outset

15     of a chapter 11 case, the bankruptcy court's subject matter

16     jurisdiction extends not only to the case but also to civil

17     proceedings arising under title 11 or arising in or related to the

18     case. 28 U.S.C. § 1334(a)-(b); *see also* General Order No. 182 of the

19     Eastern District of California.  The court also has broad subject

20     matter jurisdiction over all property of the debtor as of the

21     commencement of the case and all property of the estate.  28 U.S.C.

22     §§ 1334(e); *see also In re Millenium Seacarriers, Inc.*, 419 F.3d 83,

23     96 (2d Cir. 2005).  After confirmation of a plan, bankruptcy courts

24     continue to have jurisdiction over civil proceedings arising under

25     title 11 or arising in a case.  But bankruptcy courts only retain

26     "related to" jurisdiction over matters that bear a close nexus to the

27     case, i.e., matters that affect the interpretation, implementation,

28     consummation, execution, or administration of the confirmed plan.

*Wilshire Courtyard v. Cal. Franchise Tax Board (In re Wilshire Courtyard)*, 729 F.3d 1279, 1284-87 (9th Cir. 2013).  And ancillary jurisdiction provides a federal court a jurisdictional basis to enforce a settlement agreement before dismissal of an underlying civil action over which the court already has jurisdiction.  *T Street Dev., LLC v. Dereje and Dereje*, 586 F.3d 6, 10 (D.C. Cir. 2009); *Bryan v. Erie County Office of Children and Youth*, 752 F.3d 316, 322 (3d Cir. 2014).

Similarly, as this dispute is a core proceeding, this court may issue final orders and judgments resolving it.  Bankruptcy judges may issue final orders and judgments in matters that are core, and absent consent of the parties, bankruptcy judges may hear—but not finally decide—matters that are noncore.  28 U.S.C. § 157(b)(1), (c)(1). Matters such as plan confirmation and settlements that materially modify the terms of a confirmed chapter 11 plan are core proceedings. *See id.* § 157(b)(2)(L); *see also In re U.S. Brass Corp.*, 301 F.3d 296, 303-06 (5th Cir. 2002).  And actions asserting stay violations, as the underlying action here, are core proceedings.  *Id.* § 157(b)(2)(A), (G), (O); *compare In re Goodman*, 991 F.2d 613, 616-17 (9th Cir. 1993) (stay-violation actions arising under the Bankruptcy Code), *with Rosner v. Worcester (In re Worcester)*, 811 F.2d 1224, 1229 n. 5 (9th Cir. 1987) (proceedings related to foreclosure sale's validity arising from state-created rights).

## IV.    DISCUSSION

### A.    Law Governing Settlement

A party seeking to enforce a settlement carries the burden of demonstrating the existence of a legally enforceable agreement. *Andreyev v. First Nat'l Bank of Omaha (In re Andreyev)*, 313 B.R. 302,

9

305 (9th Cir. BAP 2004).

In the absence of controlling federal authority, state law governs the enforceability of settlement agreements. *O'Neil v. Bunge Corp.*, 365 F.3d 820, 822 (9th Cir. 2004); *United Comm. Ins. Servs., Inc. v. Paymaster Corp.*, 962 F.2d 853, 856 (9th Cir. 1992). "A settlement agreement is a contract, and the legal principles which apply to contracts generally apply to settlement contracts." *Weddington Prods., Inc. v. Flick*, 60 Cal. App. 4th 793, 810 (1998). "The essential elements of a contract are: parties capable of contracting; the parties' consent; a lawful object; and sufficient cause or consideration." *Lopez v. Charles Schwab & Co.*, 118 Cal. App. 4th 1224, 1230 (2004).

Settlements between the trustee (or debtor-in-possession) and a third party affecting property of the estate have long been subject to controlling federal authority requiring court approval. *Lincoln Nat'l Life v. Scales*, 62 F.2d 582, 585 (5th Cir. 1933) (citing § 27 of the Bankruptcy Act, the court held the trustee "may not compromise or arbitrate anything except under the court's approval"); *Matter of Nat'l Pub. Serv. Corp.*, 68 F.2d 859, 862 (2nd Cir. 1934) (bankruptcy court always has the last word with respect to compromises).

As a result, the existence of a binding contract between the parties is a necessary but not sufficient basis to enforce a settlement agreement. Absent bankruptcy, the settlement would be enforceable under California law. The central question then is the effect of bankruptcy law on the bargained-for resolution.

**B.    The Effect of Plan Confirmation**

Confirmation of a chapter 11 plan binds the debtor, creditors, and equity security holders. 11 U.S.C. § 1141(a) ("the provisions of

1   a confirmed plan bind"); *Trulis v. Barton*, 107 F.3d 685, 691 (9th Cir.

2   1995). Moreover, the confirmation order has res judicata effect on

3   issues that were raised in conjunction with plan confirmation or could

4   have been raised at that time. *Prudence Realization Corp. v. Ferris*,

5   323 U.S. 650, 654-55 (1944); *Katchen v. Landy*, 382 U.S. 323, 334

6   (1966); *Stoll v. Gottlieb*, 305 U.S. 165 (1938).

7          As applicable here, the binding nature of the plan cuts two ways.

8   In the first instance, it cuts against First-Citizens Bank by

9   requiring it to withhold collection efforts, including foreclosure.

10  11 U.S.C. §§ 362(a), (c), 1141(b), (d)(1). The stay protects the

11  debtor, the debtor's property, and property of the estate. *In re*

12  *Casgul of Nevada, Inc.*, 22 B.R. 65, 66 (9th Cir. BAP 1982).

13  Ordinarily, in chapter 11 the stay terminates as to the debtor and as

14  to the estate upon confirmation of the plan. 11 U.S.C. §§ 362(c),

15  1141(b), (d)(1)(A). But chapter 11 debtors may extend the in personam

16  and in rem protections of the stay beyond confirmation by deferring

17  (i) discharge and (ii) revesting of estate property in the debtor.

18  *See id.; Hillis Motors, Inc. v. Hawaii Auto. Dealers' Ass'n.*, 997 F.2d

19  581, 587 (9th Cir. 1993). Here, Oakhurst Lodge availed itself of

20  these extended-stay protections in the plan. This bound First-

21  Citizens Bank and required it to withhold foreclosure proceedings

22  against the motel unless and until it obtained an order granting stay

23  relief. When First-Citizens Bank foreclosed its liens on the motel

24  and evicted Oakhurst Lodge without seeking stay relief, it ended

25  Oakhurst Lodge's efforts to reorganize and damaged other creditors in

26  the amount that the plan had promised each creditor.

27          In the second instance, the binding nature of the plan cuts

28  against Oakhurst Lodge. Confirmed plans resemble consent decrees,

11

1  which have characteristics of both a contract and a judgment.  *Hillis*

2  *Motors*, 997 F.2d at 588 (citing *Rufo v. Inmates of Suffolk County*

3  *Jail*, 502 U.S. 367, 378 (1992)).  The plan obligated Oakhurst Lodge to

4  pay First-Citizens Bank the secured debt specified in the plan.  And

5  absent relief from the confirmation order or a court-approved

6  modification of the plan, it continues to bind Oakhurst Lodge and

7  restricts its freedom to settle disputes with third parties in a

8  manner that reduces the amount creditors will receive under the terms

9  of the confirmed plan.

10      **C.   Subsequent Events**

11          **1.   Conversion and dismissal**

12  The court next considers the effect of the conversion and dismissal of

13  the case on the confirmed plan.  While there is no case directly on

14  point, Ninth Circuit authority suggests limited circumstances under

15  which the binding effect of a confirmed chapter 11 plan may be

16  vacated.  These circumstances include (1) a successful appeal of the

17  confirmation order, *In re Lowenschuss*, 170 F.3d 923, 932 (9th Cir.

18  1999); (2) a revocation of such order within 180 days if confirmation

19  was procured by fraud, 11 U.S.C. § 1144; *In re Orange Tree Assocs.,*

20  *Ltd.*, 961 F.2d 1445, 1447 n. 6 (9th Cir. 1992); and (3) a motion for

21  relief from such order based on lack of notice to the affected

22  creditor, *In re Downtown Investment Club III*, 89 B.R. 59 (9th Cir. BAP

23  1988).  The binding nature of a confirmed plan is such that a debtor

24  may not modify it by filing a second chapter 11 case, absent a showing

25  of a "fundamental change" in market conditions.  *In re Caviata*

26  *Attached Homes, LLC*, 481 B.R. 34, 46-48 (9th Cir. BAP 2012) (affirming

27  dismissal of the subsequent chapter 11 because the "changed

28  circumstances were not unforeseeable").  But "[i]mproper plan

12

provisions do not remove the res judicata effect of plan
confirmation." *In re Ground Sys., Inc.*, 213 B.R. 1016, 1019-20 (9th
Cir. BAP 1997).

Moreover, conversion of a chapter 11 case to chapter 7 does not
vacate the order confirming the plan. *See* 11 U.S.C. § 348 (omitting
any reference to §§ 1129 and 1141). And courts that have squarely
confronted the issue hold that conversion does not vitiate the binding
nature of the plan. *Still v. Rossville Bank (In re Chattanooga
Wholesale Antiques, Inc.)*, 930 F.2d 458 (6th Cir. 1991) (trustee not
allowed to avoid debtor's payments to creditors under the terms of a
confirmed chapter 11 plan made before conversion to chapter 7); *Bank
of La. v. Pavlovich (Matter of Pavlovich)*, 952 F.2d 114 (5th Cir.
1992) (creditor could not object to discharge or dischargeability of
preconfirmation debts after chapter 11 plan had discharged debts);
*Laing v. A.G. Johnson (In re Laing)*, 31 F.3d 1050 (10th Cir. 1994)
(stipulation that a particular debt was non-dischargeable as a part of
a chapter 11 proceeding bound debtor after case was converted to
chapter 7); *In re Troutman Enters., Inc.*, 253 B.R. 8, 13 (6th Cir. BAP
2000); *In re BNW, Inc.*, 201 B.R. 838, 850 (S.D. Ala. 1996).

Admittedly, the answer to the same question after conversion from
chapter 13 is different. *See Harris v. Viegelahn*, 135 S. Ct. 1829,
1838 (2015) (citing § 103(i)) ("When a debtor exercises his statutory
right to convert, the case is placed under Chapter 7's governance, and
no Chapter 13 provision holds sway."). And an argument might be
advanced for applying *Viegelahn*'s logic in the context of a case
converted from chapter 11 to chapter 7. To begin with, § 103(g)
provides: "Except as provided in section 901 of this title,
subchapters I, II, and III of chapter 11 of this title apply only in a

13

case under such chapter."  Section 1141(a)'s provision that a
confirmed chapter 11 plan binds falls within § 103(g)'s scope, so it
could be argued that § 1141(a) would no longer apply after a
conversion to chapter 7.  If § 1141(a) no longer applies, then
confirmed chapter 11 plans can no longer bind the parties after
conversion from chapter 11 to chapter 7.

While facially appealing, the court rejects this argument.  A
Ninth Circuit decision has stated that "section 1144 is the only
avenue for revoking confirmation of a plan of reorganization."  *In re
Orange Tree Assocs., Ltd.*, 961 F.2d 1445, 1447 n.6 (9th Cir. 1992)
(quoting *In re Longardner & Assoc., Inc.*, 855 F.2d 455, 460 (7th Cir.
1988)).  And this precedent implies that a chapter 11 plan's binding
effect survives conversion to chapter 7 or dismissal.

Further, while both chapter 13 and chapter 11 of the Bankruptcy
Code contain a provision allowing a court to vacate a confirmation
order procured by fraud, those provisions are notably different.
Section 1144 provides, "On request of a party in interest at any time
before 180 days after the date of the entry of the order of
confirmation, and after notice and a hearing, the court may revoke
such order **if and only if** such order was procured by fraud."  11
U.S.C. § 1144 (emphasis added).  Contrast this language with § 1330's
language on revocation of a confirmed chapter 13 plan: "On request of
a party in interest at any time within 180 days after the date of the
entry of an order of confirmation under section 1325 of this title,
and after notice and a hearing, the court may revoke such order **if**
such order was procured by fraud."  *Id.* § 1330(a) (emphasis added).

Section 1330 allows revocation if plan confirmation was procured
by fraud but does not exclude other bases for reversing the binding

14

effect of the confirmation order after conversion, e.g., §§ 103(i) and

348(e).  But § 1144's use of the phrase "if and only if" restricts the

basis for revocation of the confirmation order to the procuring of

such order by fraud, and this restriction excludes other bases for

revocation after conversion, e.g., §§ 103(g) and 348(a).

Moreover, unwinding the effect of a confirmed chapter 13 plan is more straightforward than unwinding the effect of a confirmed chapter 11 plan.  By inference, the finality of the confirmation order, therefore, retains more importance after conversion from chapter 11 than it does after conversion from chapter 13.  *See Caviata Attached Homes*, 481 B.R. at 46 (noting that reliance on the chapter 11 confirmation order supports a strong need for finality).

After conversion from chapter 13, unwinding the effects of a confirmed but failed chapter 13 plan ordinarily is as simple as requiring the chapter 13 trustee to refund undistributed plan payments. *See Viegelahn,* 135 S. Ct. at 1837-40.  Payments already made by the chapter 13 trustee during the life of the plan need not be unwound and recovered after conversion or dismissal.  11 U.S.C. §§ 348(f)(1)(A), 349(b), 549(a).  And since conversion usually occurs before the chapter 13 discharge is entered, there is no need to disturb a discharge upon conversion.  *See id.* § 1328(a) (discharge occurs only at the end of a confirmed plan's term after completion of plan payments).  A chapter 13 case that is dismissed, moreover, merely falls out of the chapter 13 process, and parties are returned to the status quo ante.

Unlike chapter 13 plans, however, chapter 11 plans are frequently implemented by complex transactions that would be difficult, if not impossible, to disentangle after confirmation.  Such transactions may

include transfers of property of the estate; mergers or consolidation of the debtor with other entities; cancellation of indentures; changes to the interest rate or other terms of outstanding securities; amendment of the debtor's charter; issuance of securities for cash, for property or existing securities.  *See* 11 U.S.C. § 1123(a)(5)(B), (C), (F), (H)-(J).  Chapter 11 plans may provide for the settlement or adjustment of claims or provide for the sale of estate property and distribution of the sale proceeds among holders of claims or interests.  *Id.* § 1123(b).  Usually, discharge of the debtor and revesting of estate property in the debtor occurs at confirmation. *Id.* § 1141(b), (d)(1).  And it is for this reason that Congress made a measured choice in enacting § 1144 to allow a confirmation order to be revoked only under the narrowest circumstance.

In chapter 11, moreover, debtors, creditors, and third parties substantially change their position in reliance on the confirmation order.  Considering this reliance rationale for the narrow ground for revocation under § 1144, one court stated:

> Any number of scenarios can and do play out under the terms of a confirmed plan. Credit is extended, assets are sold, corporate entities are created or merged, and so on. Presumably mindful of the intricate chain of events that is often set in motion by the order of confirmation, Congress made the considered choice that only fraud would warrant an attempt to "unscramble the egg," and even then only within the 180-day time frame imposed by § 1144.

*In re Winom Tool & Die, Inc.*, 173 B.R. 613, 616 (Bankr. E.D. Mich. 1994).  Given these reliance interests in play, confirmed chapter 11 plans have a binding effect that is durable.

Indeed, even dismissal of a chapter 11 case does not vacate the confirmation order.  *Matter of Depew*, 115 B.R. 965, 967-68 (Bankr.

1   N.D. Ind. 1989) ("dismissal does not revoke debtors' discharge[,] and

2   their obligations to creditors, as set forth in the confirmed plan,

3   remain unaltered."); *In re Space Bldg. Corp.*, 206 B.R. 269, 274 (D.

4   Mass. 1996) ("[C]ourts which have considered whether dismissal or

5   conversion of a Chapter 11 case revokes a confirmed Plan, consistently

6   have determined that it does not."); *U.S. v. Ramirez*, 291 B.R. 386,

7   391-92 (N.D. Tex. 2002); *Am. Bank and Trust Co. v. United States ex.*

8   *Rel. Internal Revenue Service (In re Barton Indus., Inc.)*, 159 B.R.

9   954, 957-60 (Bankr. W.D. Okla. 1993).

10       In short, neither the conversion of Oakhurst Lodge's chapter 11

11  case to chapter 7 nor the dismissal of its chapter 7 case affect the

12  binding nature of the confirmed plan.  In any event, any argument that

13  the conversion or dismissal dissolved the confirmation order would be

14  misplaced: the court vacated both the conversion and dismissal orders

15  on First-Citizens Bank's Rule 60(b) motion.  Once these orders were

16  vacated, the case was returned to the status quo, with Oakhurst Lodge

17  operating under the terms of the confirmed chapter 11 plan, *see*

18  *Ballard v. Baldridge*, 209 F.3d 1160 (9th Cir. 2000), and reorganizing

19  under the supervision of the bankruptcy court, see *Hillis Motors,*

20  *Inc.*, 997 F.2d at 589.

21       **2.   The chapter 7 trustee's abandonment of the motel**

22       The chapter 7 trustee's abandonment of the motel also does not

23  impact Oakhurst Lodge's ability to seek redress for the stay

24  violation.  First, this court construes the chapter 7 trustee's

25  abandonment narrowly.  The trustee abandoned only an interest in a

26  "60-unit motel with [a] residence" and "all fixtures and equipment

27  involved in the operation of the motel."  *See* 11 U.S.C. § 554(a); Fed.

28  R. Bankr. P. 6007(a).  The abandonment made no mention of either the

17

stay violation or the estate's right to seek redress for that wrong.

Second, even if the language of the trustee's abandonment were construed to include the right to redress the stay violation, the plan's reservation of claims to Oakhurst Lodge precluded the chapter 7 trustee from abandoning this asset. The confirmed plan reserved to the debtor "all powers granted by the Bankruptcy Code," and Oakhurst Lodge preserved unto itself all "rights against any and all third parties" whether those "rights arose before, on or after the petition date, the confirmation date, the effective date and/or the distribution date." First-Citizens Bank's post-confirmation violation of the stay falls neatly within the rights and claims reserved to Oakhurst Lodge as the reorganized debtor. As a result, the trustee lacked the power to abandon that right despite the language of the abandonment.

Third, the trustee could not abandon any right held *by the debtor* to seek redress for violation of its in personam stay. As *Matter of S.I. Acquisition, Inc.*, 817 F.2d 1142, 1146-48 (5th Cir. 1987) explains, the stay has both in personam and in rem protections. The former protects the debtor, and the latter protects the estate. Section 362 provides:

> [A] petition . . . operates as a stay, applicable to all entities, of—
>
> (1) the commencement or continuation . . . of a judicial, administrative, or other action or proceeding **against the debtor** that was or could have been commenced before the commencement of a case under this title . . . ;
>
> (2) the enforcement, **against the debtor or against property of the estate**, of a judgment obtained before the commencement of the case under this title;
>
> (3) any act to obtain possession of **property of**

           **the estate** or property from the estate or to
exercise control over **property of the estate**;

           (4) any act to create, perfect, or enforce any
lien against **property of the estate**;

           (5) any act to create, perfect, or enforce
against **property of the debtor** any lien to the
extent that such lien secures a claim that arose
before the commencement of the case under this
title;

           (6) any act to collect, assess, or recover a
claim **against the debtor** that arose before the
commencement of the case under this title . . . .

11 U.S.C. § 362(a)(1)-(6) (emphases added). "An automatic stay is
created by section 362(a) for benefit [sic] of the debtor; see, e.g.,
paragraphs (1), (2), (6) [of § 362(a)]; the debtor's property,
paragraph (5) [of § 362(a)]; or the debtor's estate, paragraphs (2),
(3), (4) [of § 362(a)]." *In re Casgul of Nev., Inc.*, 22 B.R. 65, 66
(9th Cir. BAP 1982); *accord Gasprom, Inc. v. Fatech (In re Gasprom)*,
500 B.R. 598, 604-07 (9th Cir. BAP 2013) (notwithstanding trustee's
abandonment of estate property, holding that the stay continued to
protect property of the debtor under § 362(a)(5) and that post-
petition foreclosure sale violated that stay). It follows that the
debtor holds rights of redress for acts that violate § 362(a)(1), (2),
(6), *see In re Goodman*, 991 F2d 613, 619-20 (9th Cir. 1993), and the
estate holds rights of redress for acts that violate §§ 362(a)(2)-(4),
*see In re Pace*, 67 F.3d 187, 193-94 (9th Cir. 1995) (trustee).

    And a single act can violate both the in rem rights of the estate
and the in personam rights of the debtor. Such a single act occurred
here. Specifically, First-Citizens Bank's foreclosure violated both
the estate's in rem right to preserve property for the benefit of all
creditors, *see* § 362(a)(3)-(4), and Oakhurst Lodge's in personam right
to reorganize its business affairs without the interference of

creditors, see § 362(a)(6); see also In re RW Meridian LLC, 564 B.R. at 27-33 (finding post-petition tax sale of real property violated § 362(a)(3), (4), (6)); Gasprom, Inc. v. Fatech (In re Gasprom), 500 B.R. at 604-07 (holding post-petition foreclosure sale violated the stay applicable to chapter 7 debtor under § 362(a)(5) notwithstanding the trustee's abandonment of the property sold at foreclosure sale); In re Faitalia, 561 B.R. 767, 774 (9th Cir. BAP 2016) (dicta stating that foreclosure of a lien after commencement of a case would violate § 362(a)(1), (4) and (6)); see also In re Advanced Ribbons & Office Prods., Inc., 125 B.R. 259 (9th Cir. BAP 1991) (foreclosure of stock owned by non-debtor guarantor not a violation of the stay).

In brief, Oakhurst Lodge now holds rights-on behalf of both the estate and itself as a reorganized debtor-to pursue the stay violation occasioned by the foreclosure.  This is true despite the chapter 7 trustee's abandonment of the motel, residence, and related property. The abandonment does not eliminate Oakhurst Lodge's standing, therefore, to pursue the underlying adversary action in which this motion to enforce a settlement arises.

### D.  The Standard for Approval of the Settlement

By what standard should approval of a post-confirmation compromise in chapter 11 between a reorganized debtor and a third party be approved or denied?  Two rules jockey for position.  Most courts inquire whether the settlement materially alters the terms of the confirmed plan under § 1127(b).  See In re Joint E. & S. Dist. Asbestos Litig., 982 F.2d 721, 747-48 (2nd Cir. 1992); In re Ionosphere Clubs, Inc., 208 B.R. 812, 815-16 (S.D.N.Y. 1997); In re U.S. Brass Corp., 301 F.3d 296, 303 (5th Cir. 2002) (applying § 1127(b) analysis despite bankruptcy court's application of Rule

9019); *SCH Corp. v. CFI Class Action Claimants*, 597 Fed. Appx. 143 *4-
*5 (D. Del. 2015); *Reserve Capital Corp. v. Levine*, 2007 WL 329179 *4
(N.D.N.Y. Jan. 30, 2007) (finding settlement fair and equitable under
Rule 9019 but remanding for failure to consider plan modification
under § 1127(b)). But Some courts concern themselves solely with the
good faith and fair and equitable standards of Rule 9019. *In re
Hollywell Corp.*, 93 B.R. 291, 294-95 (Bankr. S.D. Fla. 1988); *In re
Am. West Airlines, Inc.*, 214 B.R. 382, 385-86 (Bankr. D. Ariz. 1997);
*In re Key3Media Group, Inc.*, 336 B.R. 87, 92-98 (Bankr. D. Del. 2005).

       This court concludes that a post-confirmation settlement that
materially changes the rights and duties of the reorganized debtor,
creditors, or equity security holders must be reviewed under §
1127(b)'s standards for plan modification. This is true despite the
existence of alternative standards under Rule 9019 because a rule of
procedure cannot override a substantive right provided for by the
Bankruptcy Code when they conflict. *See* 28 U.S.C. § 2075; *In re Pac.
Atl. Trading Co.*, 33 F.3d 1064, 1066 (9th Cir. 1994); *In re Wolfberg*,
255 B.R. 879, 883 (9th Cir. BAP 2000), *aff'd*, 37 F. App'x. 891 (9th
Cir. 2002). Indeed, § 1141(a) provides that a confirmed plan binds
the debtor, creditors, and equity security holders as a "new contract"
between the debtor and its creditors. *In re Dow Corning Corp.*, 456
F.3d 668, 676 (6th Cir. 2006) (citing *Hillis Motors, Inc. v. Haw.
Auto. Dealers' Ass'n*, 997 F.2d 581, 588 (9th Cir. 1993)). Any party
wishing to alter the terms of this binding decree must do so by plan
modification in the manner described in § 1127(b). And modifying the
confirmed plan requires adherence to procedural safeguards for all
parties affected, *see* § 1127(b), 1129, and Rule 3019(b), and
compliance with specific statutory standards, §§ 1122, 1123, 1127(b),

1   and 1129.  It follows that the terms of the confirmed plan and §

2   1127(b) govern the enforcement of a post-confirmation settlement that

3   materially changes the rights and duties of the parties affected by

4   the confirmed plan.

5        In contrast to the standards governing chapter 11 plan

6   modification, Rule 9019 operates under more discretionary standards

7   articulated in *In re A & C Properties.  See In re A & C Props.*, 784

8   F.2d 1377, 1381 (9th Cir. 1982).  Under these standards, the court may

9   approve such a settlement if it was negotiated in good faith and is

10  fair and equitable.  *Id.*  "Fair and equitable" involves a

11  consideration of four factors: (i) the probability of success in the

12  litigation; (ii) the difficulties to be encountered in collection;

13  (iii) the complexity of the litigation, and the expense, delay and

14  inconvenience necessarily attendant to the litigation; and (iv) the

15  paramount interest of creditors and a proper deference to the

16  creditors' expressed wishes, if any.  *Id.*  So applying these flexible

17  standards to a settlement that changes creditors and equity holders'

18  rights under a confirmed plan would undercut their procedural and

19  substantive rights under §§ 1122, 1123, 1125, 1127(b), 1129 and

20  1141(a).

21       This conclusion is consistent with long-held notions as to when a

22  compromise or settlement is governed by Rule 9019 as opposed to other

23  provisions of the Bankruptcy Code or Rules.  Rule 9019 is silent on

24  the subject.  But current Rule 9019 derives from Section 27 of the

25  former Bankruptcy Act of 1898 and former Rule 919, a rule that had

26  been adapted from § 27 of the Bankruptcy Act.  *See In re City of*

27  *Stockton*, 486 B.R. 194, 196 (Bankr. E.D. Cal. 2013) (tracing the

28  history of Rule 9019 from § 27 of the Act and noting that the Code

22

carried forward case law applicable to § 27). Section 27 of the
former Bankruptcy Act provided as follows: "The trustee may, with the
approval of the court, compromise any controversy arising in the
administration of the estate upon such terms as he may deem for the
best interests of the estate." Bankruptcy Act of 1898, § 27, Act of
July 1, 1988, 30 Stat. 553-54, *as amended*, Chandler Act, § 27, Act of
June 22, 1938, 52 Stat. 855, *repealed* 1979 (emphasis added). Section
27 was thus "intended to supply a summary and inexpensive way of
settling questions arising in the administration of bankrupt estates."
*In re Ben L. Berwald Shoe Co.*, 1 F.2d 494, 496 (N.D. Tex. 1924), *rev'd
on other grounds*, 10 F.2d 275 (5th Cir. 1926). But it was never
intended to supplant those provisions of the Bankruptcy Act governing
plan confirmation. *See* 2A *Collier on Bankruptcy* ¶ 27.02 & nn. 20-21
(James Wm. Moore & Lawrence P. King eds., 14th ed. rev. 1978). It
could not be used to restructure the relationship between debtors and
creditors outside the authority of the Bankruptcy Act, forcing
creditors to give up property rights, incur liabilities, and accept
"many other provisions as are usually contained in a contract of
reorganization." *See In re Northampton Portland Cement Co.*, 185 F.
542, 543 (E.D. Pa. 1911); *see also In re Woodend*, 133 F. 593 (S.D.N.Y.
1904). In this context, moreover, there is no principled way to
distinguish settlements attempting plan modification from settlements
attempting plan confirmation. Both are equally impermissible.

Given its roots in § 27 of the Bankruptcy Act, Rule 9019 likewise
cannot displace the rigorous standards for plan confirmation and
modification in chapter 11. Such standards cannot be jettisoned when
settling a dispute that invokes their application. Rather, Rule 9019
must yield.

**E.   The Settlement Modifies the Confirmed Plan**

Section 1127(b) controls plan modification.  The term "modification" is not defined by the Bankruptcy Code.  A settlement that "alters the legal relationships among the debtor and its creditors" under the confirmed plan constitutes a plan modification. *In re Ionosphere Clubs, Inc.*, 208 B.R. 812, 816 (Bankr. S.D.N.Y. 1997) (extension of time to assume or reject lease); *In re U.S. Brass Corp.*, 301 F.3d 296, 303, 307 (5th Cir. 2002) (opting to settle claims by binding arbitration); *In re Joint E. and S. Dist. Asbestos Litig.*, 982 F.2d 721, 747-48 (2nd Cir. 1992) (change in obligations and payment procedures for personal injury settlement trust deemed substantive and significant).

**1.   Secured creditors rights are altered**

Under the terms of the confirmed plan, secured creditors, including the Collier Partnership and the Olsen Trust, bargained for and received under the terms of the confirmed plan a promise to pay the principal amount of their secured loans plus interest at 5.5% and 6%, respectively.  For example, the Collier Partnership was to receive a stream of income starting one year after confirmation with the entire amount due and payable 11 years after confirmation.  The Olsen Trust agreed to defer all payments until the first and second trust deeds due First-Citizens Bank had been paid in full (estimated to be 22 years after confirmation).  But each creditor was to retain its lien until the entire amount of its principal and interest had been paid in full.

But the settlement does not pay secured creditors' claims in full. Because it fails to pay their claims in full, the settlement materially alters the rights of the secured creditors.

1    Equally important to the analysis is the settlement's endorsement
2    of a foreclosure that eliminated junior liens.  When First-Citizens
3    Bank foreclosed its first and second trust deeds, it wiped out the
4    liens held by the Collier Partnership and the Olsen Trust, leaving
5    them with unsecured claims against Oakhurst Lodge.  *See* Cal. Civ.
6    Proc. Code § 580(d); *Bargioni v. Hill*, 59 Cal. 2d 121, 122, (1963);
7    *Roseleaf Corp. v. Chierighino*, 59 Cal. 2d 35, 43-44, (1963).  But
8    actions, including foreclosures, taken in violation of the stay are
9    void.  *In re Gruntz*, 202 F.3d 1074, 1081-82 (9th Cir. 2000).  Void
10   acts cannot be cured or ratified.  *In re Schwartz*, 954 F.2d 569, 571
11   (9th Cir. 1992).  Except as to certain good faith purchasers, the void
12   foreclosure sale may be set aside and the property returned to the
13   estate.  11 U.S.C. § 549(a), (c).

14       Yet the settlement allows the wrongful foreclosure sale to stand,
15   contravening the terms of the confirmed plan that afforded the Collier
16   Partnership and the Olsen Trust retention of their liens until their
17   secured claims were paid in full with interest.  As a result, the
18   settlement materially and impermissibly alters their bargained-for
19   rights under the confirmed plan.

20                   **2.   Unsecured creditors' rights are altered**

21       The settlement is insufficient to pay priority and general
22   unsecured creditors, including deficiency claims held by the now sold-
23   out third and fourth trust deed holders, under the terms of the
24   confirmed plan.  Including secured and unsecured debt, the amount
25   necessary to fund the confirmed plan is approximately $1.48 million.[12]

26   _____

27   [12] The amount due does not include: (1) amounts due First-Citizens Bank on its
     first and second trust deeds (as provided in the proposed settlement
     agreement); (2) "statutorily required" interest on priority tax claims; or
28   (3) U.S. Trustee's fees.  It also assumes no payments of any of these debts

1   Because the motel will not be returned to Oakhurst Lodge under the

2   settlement's terms, there would never be additional funds for payment

3   of creditors.   The settlement therefore materially alters the modified

4   plan as to unsecured creditors by paying them only slightly more than

5   one-half of the amount provided for in the plan.

6                    **3.    Equity holders' rights are altered**

7            The plan provides that Oakhurst Lodge, as a reorganized debtor,

8   would have two shareholders, Marshall and Jack Patel, who were

9   obligated to contribute new value of approximately $230,000.   The

10  record contains no admissible evidence as to whether this new-value

11  contribution was ever made.   First-Citizens Bank has not sustained its

12  burden to show a lack of equity holders interests in Oakhurst Lodge

13  having rights that must be satisfied under the confirmed plan.

14           The settlement alters the equity holders' rights under the plan.

15  This is because the confirmed plan contemplated Oakhurst Lodge's

16  emerging from the chapter 11 process operating the motel free of debt,

17  except long-term secured debt.   Depending on post-confirmation

18  operating profits and the value of the motel, the equity interests

19

20  by third parties, e.g., real property taxes due Madera County by the
    purchaser, Oakhurst Lodge, LP.   Interest computations are made based on the
21  passage of 1,705 days between the effective date, March 15, 2012, and the
    date of the hearing on the motion to enforce the settlement, November 15,
22  2017.

23  As of the date of the hearing on the motion to enforce, the amount due under
    the plan was approximately $1,481,878.   This sum was calculated to include
24  the following: (1) professional fees of $12,000; (2) the Collier
    Partnership's claim of $407,241 ($324,000 principal + $83,241 interest at
25  5.5%); (3) the Olsen Trust's claim of $501,867 ($392,000 principal + $109,867
    interest at 6%); (4) On Deck Capital's claim of $66,464 ($56,000 principal +
26  $10,464 interest at 4%); (5) TimePayment Corp.'s claim of $26,111 ($22,000
    principal + $4,111 interest at 4%); (6) the County of Madera's claim of
27  $154,195 ($125,000 principal + $29,195 interest at 5%); (7) priority
    unsecured tax claims of $202,000; and (8) non-insider unsecured claims of
28  $112,000.

1    owned by Marshall and Patel may or may not have had value at this time

2    had the foreclosure not occurred.  But the settlement leaves the motel

3    in the hands of First-Citizens Bank's buyer, Oakhurst Lodge, LP.  So

4    contrary to the confirmed plan's terms, the settlement relegates

5    equity holders to ownership of an empty shell with shares of no

6    value.[13]

7        **F.    The Settlement Does Not Satisfy § 1127(b)**

8        Section 1127(b) provides:

9            The proponent of a plan or the reorganized debtor
             may modify such plan at any time after
10           confirmation of such plan and before substantial
             consummation of such plan, but may not modify
11           such plan so that such plan as modified fails to
             meet the requirements of sections 1122 and 1123
12           of this title. Such plan as modified under this
             subsection becomes the plan only if circumstances
13           warrant such modification and the court, after
             notice and a hearing, confirms such plan as
14           modified, under section 1129 of this title.

15       Here, the settlement modifies the confirmed plan but does not

16   comply with § 1127(b).

17                **1.    Substantial consummation**

18       The plan proponent carries the burden that there has been no

19   substantial consummation.  *In re Antiquities of Nev., Inc.*, 173 B.R.

20   926, 929 (9th Cir. BAP 1994).  Section 1101(2) provides:

21           "[S]ubstantial consummation" means--(A) transfer
             of all or substantially all of the property
22           proposed by the plan to be transferred; (B)
             assumption by the debtor or by the successor to
23           the debtor under the plan of the business or of
             the management of all or substantially all of the
24           property dealt with by the plan; and (C)
             commencement of distribution under the plan.

25

26   _____

27   [13] First-Citizens Bank argues that Steven Marshall is equitably estopped to
     oppose this motion.  This court does not need to reach this issue.  Even if
28   Steven Marshall were estopped, Jack Patel is still presumptively an equity
     holder with rights under the confirmed plan.

                                       27

1    Apart from Oakhurst Lodge's initial assumption of its business after

2    confirmation, First-Citizens Bank has made no showing on the question

3    of substantial consummation.  First-Citizens Bank carries the burden

4    on that issue, so plan modification must fail.

5               **2.   Statutory process for modification**

6         Plan modification requires compliance with §§ 1122, 1123, 1125,

7    1127 and 1129.  The settlement does not satisfy § 1127(b) because it

8    alters the rights of secured creditors, unsecured creditors, and

9    equity holders without complying with this statutory framework for

10   modification.  The settlement is not presented in the form of a plan

11   that classifies claims and includes the applicable mandatory

12   provisions of § 1123(a), such as specifying classes of claims or

13   interests that are not impaired under the plan and identifying the

14   treatment of the impaired classes.  No disclosure statement has been

15   approved and transmitted to all creditors under § 1125.  *See* 11 U.S.C.

16   § 1125, 1127(c).  And no holder of a claim or interest has been given

17   a chance to change such holder's previous acceptance or rejection of

18   the plan.  *Id.* § 1127(d).  No evidence has been offered to show that

19   all requirements of § 1129 have been satisfied.

20             **3.   Adequate means of implementation**

21        "Notwithstanding any otherwise applicable nonbankruptcy law, a

22   plan shall . . . provide adequate means for the plan's

23   implementation."  *Id.* § 1123(a)(5).  The settlement, deemed a plan

24   modification, changes how the plan's implementation will be

25   accomplished.  Rather than paying creditors from continued motel

26   operations, it provides for release of First-Citizens Bank's secured

27   claims and a one-time cash payment of $850,000.  But as to creditors

28   other than First-Citizens Bank, it fails to provide a principled basis

28

1  to determine how the available, but insufficient, funds should be

2  divided among the pool of non-bank creditors.  And having failed to

3  adhere to the statutory process for modification, the settlement does

4  not identify the treatment of each class of claims, making it

5  impossible to perform.  As to equity holders, it fails to return the

6  motel to them, subject to the four deeds of trust, or to provide them

7  with the unliquidated cash equivalent of their equity interests.

8  **V.    CONCLUSION**

9       For each of these reasons, the settlement materially alters

10  creditors and equity holders' rights under the confirmed plan but does

11  not satisfy § 1127(b).  The motion will be denied.  The court will

12  issue a separate order.

14  Dated: March 28, 2018

_____
Fredrick E. Clement
United States Bankruptcy Judge

## Instructions to Clerk of Court
## Service List

The Clerk of Court is instructed to send the Order/Judgment or other court generated document transmitted herewith to the parties below. The Clerk of Court will send the Order via the BNC or, if checked ____, via the U.S. mail.

      Debtor(s), Attorney for the Debtor(s), Bankruptcy Trustee (if appointed in the case), and ___X_____ Other Persons Specified Below:

Donna M. Standard, Esq.
35625 E. Kings Canyon Road
Squaw Valley, California 93675

Frank Weiser, Esq.
3460 Wilshire Blvd., Suite 1212
Los Angeles, California 90010

Robert A. Hawkins, Esq.
Chapter 7 Trustee
1849 N. Helm, #110
Fresno, California 93727

Office of the United States Trustee
2500 Tulare Street
Suite 1401
Fresno, California 93721

Oakhurst Lodge, LP
C/O Michael Heath
Agent for Service of Process
P. O. Box 616
Novato, California 94948-0616

Aaron Malo, Esq.
SHEPPARD, MULLIN, RICHTER & HAMPTON
650 Town Center Drive, 4th Floor
Costa Mesa, California 92626-=1993

Nicole L. Glowin, Esq.
T. Robert Finley, Esq.
Helen Cayton, Esq.
WRIGHT, FINLAY & ZAK
4665 MacArthur Court, Suite 200
Newport Beach, California 92660

Michael Wilhelm, Esq.
WALTER & WILHELM LAW GROUP
205 E. River Park Cir. Suite 410
Fresno, California 93720